IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:18-CV-108-D

GUY FERRANTE, and           )
DEBORAH FERRANTE,           )
                            )
              Plaintiffs,   )
                            )
       v.                   )                    **ORDER**
                            )
WESTIN ST. JOHN HOTEL CO.,  )
and VISTANA SIGNATURE       )
EXPERIENCES,[1]             )
                            )
              Defendants.   )


On June 19, 2018, Guy Ferrante ("Guy") and Deborah Ferrante ("Deborah;" collectively, the

"Ferrantes" or "plaintiffs") filed a complaint against Westin St. John Hotel Co. ("Westin") and

Vistana Signature Experiences ("Vistana"; collectively, "defendants") [D.E. 1]. On October 30,

2018, the Ferrantes amended their complaint [D.E. 19]. On July 30, 2019, Westin and Vistana

moved for summary judgment [D.E. 48, 55] and filed statements of material fact and documents in

support [D.E. 49–54, 56–61]. On August 8, 2019, the Ferrantes moved for summary judgment [D.E.

64] and filed a statement of material fact and documents in support [D.E. 65]. On August 23, 2019,

the Ferrantes responded to Westin's and Vistana's motions [D.E. 66, 67]. On August 30, 2019,

Westin and Vistana responded to the Ferrantes' motion [D.E. 69]. As explained below, the court

grants Westin's and Vistana's motions for summary judgment, and denies the Ferrantes' motion for

summary judgment.

---

[1] Defendant Vistana Signature Experiences is registered under the business name "Vistana
Signature Experiences, Inc.," and defendant Westin St. John Hotel Co. is registered under the
business name "Westin St. John Hotel Company, Inc." See [D.E. 49] 1 n.1, 2.

I.

Westin, a U.S. Virgin Islands corporation, is the developer of the Bay Vista Condominium and the Coral Vista Condominium in St. John, U.S. Virgin Islands. See [D.E. 50] ¶ 1; [D.E. 57] ¶ 1.[2] Vistana, a Delaware corporation, is the parent company of its wholly-owned subsidiary, Westin. See [D.E. 50] ¶ 2; [D.E. 57] ¶ 2. Although certain individuals serve as officers for both companies, Westin and Vistana are legally separate entities. See [D.E. 50] ¶ 4; [D.E. 53, 60].

In 2010, the Ferrantes accepted a promotional vacation at a Westin resort in St. John. See [D.E. 50] ¶ 5; [D.E. 57] ¶ 3. In January 2011, while on the promotional vacation in St. John, the Ferrantes decided to purchase a "Vacation Ownership Interest" in a two-bedroom unit, number 2435,

---

[2] Under Local Civil Rule 56.1, a party opposing a motion for summary judgment shall submit "a separate statement including a response to each numbered paragraph in the moving party's statement [of material facts]." Local Civ. R. 56.1 (a)(2). "Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Id. "Each statement by the movant or opponent . . . must be followed by citation to evidence that would be admissible, as required by Federal Rule of Civil Procedure 56(c)." Local Civ. R. 56.1(a)(4). Under Rule 56(c), a party disputing a material fact must support its position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Merely responding that a party "disputes" a material fact is insufficient under Rule 56 and Local Rule 56.1. See Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C.), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished).

The Ferrantes' response to defendants' motions for summary judgement violates Local Rule 56.1 because the Ferrantes' separate statement of material facts fails to respond to each numbered paragraph in defendants' statements of material facts. See [D.E. 68, 70]. Thus, to the extent that the Ferrantes do not oppose any statement of material fact by citing to particular parts of the record or showing that the defendants cannot support their position based on evidence in the record, the court deems the material fact admitted. See Horton v. Methodist Univ., Inc., No. 5:16-CV-945-D, 2019 WL 320572, at *1 n.1 (E.D.N.C. Jan. 23) (unpublished), aff'd, No. 19-1174, 2019 WL 6998899 (4th Cir. Dec. 20, 2019) (per curiam) (unpublished); Felton v. Moneysworth Linen Serv., Inc., 295 F. Supp. 3d 595, 597 n.1 (E.D.N.C. 2018); Howard, 262 F. Supp. 3d at 329 n.1.

at Westin's Bay Vista Condominium (the "Bay Vista Interest"). See [D.E. 50] ¶ 6; [D.E. 57] ¶ 4.

On January 30, 2011, the Ferrantes executed the Bay Vista Interest Purchase Agreement ("Bay Vista Agreement"), which incorporated by reference a Declaration of Condominium of Bay Vista Condominium ("Bay Vista Declaration"). See [D.E. 50] ¶¶ 7, 9–10; [D.E. 57] ¶¶ 5–6, 8–10. On the same date, Westin gave the Ferrantes a copy of the Bay Vista Declaration. See [D.E. 50] ¶ 8; [D.E. 57] ¶ 7. Under the Bay Vista Declaration, the Bay Vista Owners Association, Inc., operated the Bay Vista Condominium and assigned certain operational responsibilities, including collection of "annual assessments" of relevant fees, to the Westin Vacation Management Corporation ("Bay Vista Management"). See [D.E. 50] ¶¶ 13–14; [D.E. 57] ¶¶ 8–9. The Bay Vista Agreement states that the Ferrantes' "right of occupancy and use shall be governed in accordance with the Condominium Documents."[3]  [D.E. 57] ¶ 12.  The Ferrantes do not dispute that they signed the Bay Vista Agreement. See [D.E. 50] ¶ 9; [D.E. 57] ¶ 6. Moreover, only Westin was party to the Bay Vista Agreement and Declaration. See [D.E. 50] ¶¶ 10–15.

In the Bay Vista Agreement, the Ferrantes agreed to pay the purchase price according to an established payment schedule, as well as other "Charges and Assessments." See Ex. B [D.E. 58-2]. The Bay Vista Agreement defines "Charges and Assessments" as follows:

> Purchaser understands and agrees that in accordance with the provisions of the Declaration, Purchaser shall be responsible for Purchaser's proportionate share of the Common Expenses, and, if applicable, shall be responsible for Exchange Company fees. Purchaser also shall be responsible for current payment of Ad Valorem Taxes for the Vacation Ownership Interest(s) purchased . . . . Purchaser understands and agrees that, pursuant to the Declaration, the Association has the right to place liens on Purchaser's Vacation Ownership Interest.

---

[3] The Bay Vista Agreement states that all capitalized terms, if not defined therein, are defined in the Bay Vista Declaration. See [D.E. 57] ¶ 11. "Condominium Documents" is defined as the Bay Vista Declaration "together with all exhibits attached hereto and all other documents incorporated in this Declaration by reference, as the same may be amended from time to time." [D.E. 57] ¶ 13; Ex. C [D.E. 58-3] 5.

[D.E. 57] ¶ 14; Ex. B [D.E. 58-2] 4. As defined in the Bay Vista Declaration, "Common Expenses" include "Condominium Common Expenses as pertains to Unit Owners and . . . Vacation Ownership Dues as pertains to Vacation Ownership Interest Owners." [D.E. 57] ¶ 15; Ex. C [D.E. 58-3] 4. "Owners" includes those who own a "Vacation Ownership Interest" in a "Unit," or condominium. Ex. C [D.E. 58-3] 6, 7. Failure to pay the "any assessments," including Common Expenses, may result in Bay Vista Management denying use of the Bay Vista Interest. [D.E. 57] ¶¶ 16–17; Ex. C [D.E. 58-3] 20. Denial of use includes "denial of the right to make a reservation or the cancellation of a confirmed reservation." [D.E. 57] ¶ 15; Ex. C [D.E. 58-3] 20.

Generally, the annual assessments list the "Charges and Assessments" due for the upcoming yearly ownership period. See [D.E. 50] ¶ 17; [D.E. 57] ¶ 20. The Ferrantes' annual assessments for the Bay Vista Interest included charges for a Vacation Ownership Assessment, Condo Common Assessment, Estimated Real Estate Tax, and VSN Membership Fee. See [D.E. 57] ¶¶ 23–24, 26; Exs. D, E, F [D.E. 58-4–58-6]. The Ferrantes' annual assessments also included an "Approved Budget of Operating Expenses." See [D.E. 57] ¶ 23; Exs. D, E, F [D.E. 58-4–58-6]. The Vacation Ownership Fee correlates to the "Vacation Ownership Maintenance & Reserve" amount for a two-bedroom unit listed in the Approved Budget of Operating Expenses. See [D.E. 57] ¶ 26; Exs. D, E, F [D.E. 58-4–58-6]. Similarly, the Condo Common Assessment correlates to the "Condominium Common Maintenance & Reserve" amount for a two-bedroom unit listed in the Approved Budget of Operating Expenses. See [D.E. 57] ¶ 26; Exs. D, E, F [D.E. 58-4–58-6]. The annual assessments also included bold, capitalized language restating penalties for nonpayment. See [D.E. 57] ¶ 25; Exs. D, E, F [D.E. 58-4–58-6].

4

In 2014, the Ferrantes[4] purchased two time share interests in the Coral Vista Condominiums: Vacation Ownership Interest 101508-01 ("Coral Vista I") and Vacation Ownership Interest 103104-01 ("Coral Vista II"). See [D.E. 50] ¶ 25; [D.E. 57] ¶ 27. On September 3, 2014, the Ferrantes executed a purchase agreement for the Coral Vista II property ("Coral Vista II Purchase Agreement"), a secured promissory note, a pledge and security agreement, and a certificate and correlating assignment of certificate (collectively, the "Coral Vista II Documents"). See [D.E. 50] ¶ 27; [D.E. 57] ¶ 29. On September 4, 2014, Guy Ferrante executed a purchase agreement for the Coral Vista I property ("Coral Vista I Purchase Agreement;" collectively, with the Coral Vista II Purchase Agreement, the "Purchase Agreements"), a secured promissory note, a pledge and security agreement, and a certificate and correlating assignment of certificate (collectively, the "Coral Vista I Documents"). See [D.E. 50] ¶ 26; [D.E. 57] ¶ 28. The Purchase Agreements list the purchase price, initial deposit, administrative fee, total balance due, and the term of repayment. See [D.E. 57] ¶¶ 35–36; Exs. H, L [D.E. 58-8, 58-12]. In addition, the Purchase Agreements also list the "Ownership Points" associated with each property.[5] See [D.E. 57] ¶ 30; Exs. H, L [D.E. 58-8, 58-12]. The Ferrantes do not dispute that they signed the Purchase Agreements, and Vistana was not party to either agreement. See [D.E. 50] ¶¶ 28–33.

In the Purchase Agreements, the Ferrantes agreed to pay "(a) the Purchase Price; (b) the Administrative Fee; (c) annual assessments ("**Assessments**") imposed by the Trust Association; (d) special assessments (if any) or other charges imposed by the Trust Association ("**Special**

_____

[4] Guy executed the purchase agreement for Coral Vista I, while both Guy and Deborah executed the purchase agreement for Coral Vista II.

[5] "Ownership Points" are assigned primarily for purposes of reserving the property for a certain vacation period. See [D.E. 57] ¶ 30. The points are also used when assessing annual expenses.

Assessments") (e) any other applicable user fees . . . . **Assessments and Special Assessments shall be determined periodically by the Board of the Trust Association.**" [D.E. 57] ¶ 31 (emphasis in original); see Exs. H, L [D.E. 58-8, 58-12]. The Ferrantes also agreed that the Board of the Trust Association would determine these expenses "through the assessment mechanism set forth in the Operating Agreement," to which the Ferrantes agreed to join. Exs. H, L [D.E. 58-8, 58-12]. Furthermore, the Ferrantes agreed that nonpayment of any of their obligations constitutes a breach of the Purchase Agreements and that upon breach, Westin may, at its option, terminate the Purchase Agreements and retain all payments. See [D.E. 57] ¶¶ 32–34; Exs. H, L [D.E. 58-8, 58-12]. The Ferrantes also agreed that U.S. Virgin Islands law applies to any claims under the contracts. See Exs. H, L [D.E. 58-8, 58-12].

The Coral Vista I and Coral Vista II promissory notes were secured by security agreements granting Westin a purchase-money security interest in Coral Vista I and II, respectively. See [D.E. 57] ¶¶ 37–40; Exs. I–J, M–N [D.E. 58-9–58-10, 58-13–58-14]. In the security agreements, the Ferrantes agreed that default occurs at "the failure of [the Ferrantes] to pay when due any monthly installment under the [promissory notes]" or when the Ferrantes fail "to comply with any other term or provision of" the various loan documents "within 10 days following written notice from [Westin] to [the Ferrantes.]" [D.E. 57] ¶ 38; Exs. J, N [D.E. 58-10, 58-14]. The Ferrantes also agreed that, in the event of default, Westin "may proceed to enforce payment of the unpaid balance of the Obligations and the security constituted hereby and . . . may exercise any and all of its rights and remedies as are provided at law or in equity." [D.E. 57] ¶ 38; Exs. J, N [D.E. 58-10, 58-14].[6]

In November 2011, the Ferrantes received the Bay Vista Interest annual assessment for

---

[6] The Coral Vista I security agreement continues: "or by statute including, without limitation, any and all rights and remedies pursuant to the Commercial Code." Ex. J [D.E. 58-10] 2.

charges incurred during 2011. See [D.E. 50] ¶ 17; [D.E. 57] ¶ 20. The Ferrantes timely paid this Bay Vista Interest annual assessment, and also timely paid Bay Vista Interest annual assessments for 2012 through 2016. See [D.E. 50] ¶ 18; [D.E. 57] ¶ 21. From 2017 to 2019, the Ferrantes did not pay the Bay Vista Interest annual assessments. See [D.E. 50] ¶ 19; [D.E. 57] ¶¶ 20–26. In March 2017, Bay Vista Management sent notices to the Ferrantes requesting payment for the past-due 2017 annual assessment. See [D.E. 50] ¶ 20; [D.E. 57] ¶¶ 49–50. On May 15, 2018, Bay Vista Management sent, and the Ferrantes received, a "Denial of Use Notice" suspending use of the Bay Vista Interest until Westin received the past-due payments. [D.E. 50] ¶¶ 21–23; [D.E. 57] ¶¶ 51–54; Ex. 6 [D.E. 51-7, 58-7].

The Ferrantes timely paid the Coral Vista I and Coral Vista II monthly loan payments from 2014 through 2017 and the 2016 Coral Vista I annual assessment. See [D.E. 50] ¶¶ 35, 37; [D.E. 57] ¶¶ 42, 56. In 2017, the Ferrantes failed to pay both Coral Vista I and II annual assessments and stopped making loan payments. See [D.E. 50] ¶¶ 36, 38; [D.E. 57] ¶¶ 55, 57; Ex. A [D.E. 58-1] 93–94. Specifically, the Ferrantes stopped making loan payments for Coral Vista II "as of April 20, 2017" and Coral Vista I "as of May 5, 2017." [D.E. 57] ¶ 57. The Ferrantes understood that foreclosure may result from nonpayment. See [D.E. 57] ¶¶ 55, 57; Ex. A [D.E. 58-1] 120–21.

The Ferrantes principally object to the "Point Assessments" expense that is listed in the Coral Vista I and II annual assessments. See Am. Compl. at 2–3; Exs. P, Q [D.E. 58-16, 58-17]. The 2017 Coral Vista I and II annual assessments list two charges, a "2017 Base Fee" and a "2017 Points Assessment."[7] Exs. P, Q [D.E. 58-16, 58-17]. The Base Fee relates to certain "Condominium Expenses," and the Points Assessment relates to a per-ownership point proportional share of

_____

[7] The Coral Vista I and II assessments also charge a "VSN Membership Fee Add'l Week," which the Ferrantes do not dispute.

"Vacation Ownership Expenses." See [D.E. 57] ¶¶ 45–48; Exs. P, Q [D.E. 58-16, 58-17]. The Base Fee and Points Assessment are listed and calculated in the "Approved Budget of Operating Expenses" attached to the annual assessments. See [D.E. 57] ¶¶ 44–48; Exs. P, Q [D.E. 58-16, 58-17].

In April 2017, notices of default were sent to the Ferrantes for failure to make required loan payments. See [D.E. 61] ¶ 14. On August 22, 2017, Vistana Portfolio Services, Inc.,[8] sent Deborah Ferrante a "Final Notice" of default for the Coral Vista II account requiring full payment of the default amount "within ten days from the date of receipt" of the notice. See [D.E. 50] ¶ 40; [D.E. 57] ¶¶ 59, 61; Ex. R [D.E. 58-18]. On September 20, 2017, Vistana Portfolio Services, Inc., sent Guy Ferrante an identical "Final Notice" of default for the Coral Vista I account. See [D.E. 50] ¶ 40; [D.E. 57] ¶ 60; Ex. S [D.E. 58-19]. The Ferrantes did not pay either default amount. See [D.E. 50] ¶¶ 42–43; [D.E. 57] ¶¶ 62–63. On September 14, 2017, Vistana Portfolio Services, Inc., sent the Ferrantes an "Offer to Accept Collateral in Full Satisfaction" of the Ferrantes' outstanding debts in the Coral Vista II account. See [D.E. 50] ¶ 44; [D.E. 57] ¶¶ 65–66; Ex. T [D.E. 58-20]. In the letter, Vistana Portfolio Services lists the date of default, the amount of default, and the foreclosure penalty and demands that the Ferrantes pay the past-due amount within 30 days of receipt. See [D.E. 50] ¶ 44; [D.E. 57] ¶¶ 65–66; Ex. T [D.E. 58-20]. On October 19, 2017, Vistana Portfolio Services, Inc., sent Guy Ferrante an identical "Offer to Accept Collateral in Full Satisfaction" of the Ferrantes's outstanding debts in the Coral Vista I account. See [D.E. 50] ¶ 44; [D.E. 57] ¶ 65; Ex. U [D.E. 58-21].

Vistana Portfolio Services, Inc., stated in the letter that the Ferrantes could object to the

---

[8] The notice letters state that this company is "an affiliate of Coral Vista Ownership Plan, LLC." [D.E. 58-19] 1; [D.E. 58-20] 1.

proposal in writing within a 30-day period. See [D.E. 50] ¶ 45; [D.E. 57] ¶ 68; Ex. T–U [D.E. 58-20–58-21]. The Ferrantes did not object. See [D.E. 50] ¶ 45; [D.E. 57] ¶ 68; Ex. T–U [D.E. 58-20–58-21]. Westin took action to strictly foreclose on both Coral Vista I and II. See [D.E. 61] ¶ 25. The Ferrantes received a 1099-C Cancellation of Debt IRS form for both Coral Vista I and II. See Exs. 6, 7 [D.E. 64-7, 64-8]. The 1099-C form for Coral Vista II lists the "[d]ate of identifiable event" as October 30, 2017. Ex. 5 [D.E. 64-6]. The 1099-C form for Coral Vista I lists the "[d]ate of identifiable event" as November 30, 2017. Ex. 6 [D.E. 64-7].

## II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 587. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.

Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir.1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Nor will a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . be [ ]sufficient; there must be evidence

on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. In evaluating affidavits submitted in support of or in opposition to a motion for summary judgment, the court may reject inadmissible evidence described in such affidavits. See Fed. R. Civ. P. 56(c); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir.1996). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir.2011).

## A.

The Ferrantes allege that Vistana improperly prevented them from making reservations at or using the Bay Vista Interest. See Am. Compl. at 5. The court interprets the Ferrantes' complaint, in part, as a breach of contract claim. Accordingly, the court must determine the applicable law. Subject-matter jurisdiction in this case is based on diversity jurisdiction. Thus, the court applies state substantive principles and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002). A federal court sitting in diversity applies the choice-of-law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); DiFederico v. Marriott Int'l, Inc., 714 F.3d 796, 807 (4th Cir. 2013). Here, the court applies North Carolina substantive law, including North Carolina's choice of law rules.

Under North Carolina law, the "interpretation of a contract is governed by the law of the place where the contract was made." Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980); see Fried v. North River Ins. Co., 710 F.2d 1022, 1024 (4th Cir. 1983). "[T]he principle of lex loci contractus mandates that the substantive law of the state where the last act to make a binding contract occurred . . . controls the interpretation of the contract." Fortune Ins. Co.

v. Owens, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000) (emphasis omitted). For contracts, the "last act of signing the contract" governs. Szymczyk v. Signs Now Corp., 268 N.C. App. 182, 187, 606 S.E.2d 728, 733 (2005); see Bundy v. Comm. Credit Co., 200 N.C. 511, 515, 157 S.E. 860, 862 (1931). The Ferrantes signed the Bay Vista Agreement in the U.S. Virgin Islands. Thus, U.S. Virgin Islands law governs the Ferrantes' contract claims.

"[A] contract cannot bind a nonparty." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 293 (2002); see NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n, 558 U.S. 165, 174 n.4 (2010). Arthur Anderson LLP v. Carlisle, 556 U.S. 624, 632 (2009). Thus, in general, parties to a contract "cannot maintain an action" against nonparties based on the contract. Vitale & Associates, LLC v. Lowden, 690 Fed. App'x 555, 556–57 (9th Cir. 2017) (per curiam) (unpublished); see Richmond Health Facilities v. Nichols, 811 F.3d 192, 200–01 (6th Cir. 2016); Addie v. Kjaer, 51 V.I. 463, 473 (D.V.I. 2009).

As for the Ferrantes' contract claim, even viewing the evidence in the light most favorable to the Ferrantes, Vistana was not party to any contract concerning the Bay Vista Interest. Furthermore, the Ferrantes fail to produce any evidence showing that Vistana had third-party obligations under the Bay Vista Interest contract. Accordingly, the court grants Vistana's motion for summary judgment on the Ferrantes' contract claim.

The Ferrantes also allege facts that the court interprets as a claim against Vistana for tortious interference with the Bay Vista Interest contract. See Am. Compl. at 5. The court applies North Carolina substantive law, including North Carolina's choice of law rules. North Carolina uses the law of the situs, or "lex loci," test to determine the choice of law for tort claims. See Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988); Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 692, 698 S.E.2d 719, 722 (2010). "[T]he state where the injury occurred

is considered the situs of the claim." Boudreau, 322 N.C. at 335, 368 S.E.2d at 854; see Harco, 206 N.C. App. at 692, 698 S.E.2d at 722. The court must scrutinize the allegations in the amended complaint to determine "where the plaintiff has actually suffered harm." Harco, 206 N.C. App. at 697, 698 S.E.2d at 726. Where the plaintiff alleges "pecuniary loss," North Carolina courts look to where that loss occurs. See id., 698 S.E.2d at 726. Often the loss occurs where the plaintiff suffers the economic impact from its damages. See id. at 696, 698 S.E.2d at 725; see ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 49 n.11 (4th Cir. 1983); Rhone-Poulenc Agro S.A. v. Monsanto Co., 73 F. Supp. 2d 554, 555 (M.D.N.C. 1999).

The Ferrantes felt the economic loss of use of the Bay Vista Interest at their residence in North Carolina. The Bay Vista Interest is located in the U.S. Virgin Islands, and the Ferrantes signed the contract for the property in the U.S. Virgin Islands. At the same time, the Ferrantes received invoices, notices, settlement offers, and other correspondence at their residence in North Carolina. In addition, the Ferrantes felt the harm of Vistana's alleged denial of use of the Bay Vista Interest, if anywhere, in North Carolina. Thus, North Carolina law applies to the Ferrantes's tort claims.

Assuming that the Ferrantes adequately assert tortious misrepresentation,[9] the Ferrantes must

---

[9] North Carolina recognizes fraudulent misrepresentation and negligent misrepresentation. "To prove a claim of fraudulent misrepresentation, the party asserting it must show (i) false representation or concealment of a material fact, (ii) reasonably calculated to deceive, (iii) made with intent to deceive, (iv) which does in fact deceive, (v) resulting in damage to the injured party." Taylor v. Gore, 161 N.C. App. 300, 303, 588 S.E.2d 51, 54 (2003) (quotation omitted); see Busch v. Ohio Nat'l Life. Assurance Corp., No. 5:09-CV-355-D, 2011 WL 902298, at *4 (E.D.N.C. 2011); Deans v. Layton, 89 N.C. App. 358, 366–67, 366 S.E.2d 560, 565–66 (1988). "To prove a claim of negligent misrepresentation, plaintiffs must show: (1) in the course of a business or other transaction in which an individual has a pecuniary interest, (2) defendants supplied false information for the guidance of others, (3) without exercising reasonable care in obtaining or communicating the information." Gore, 161 N.C. App. at 303, 588 S.E.2d at 54; see LRP Hotels of Carolina, LLC v. Westfield Ins. Co., No. 4:13-CV-94-D, 2014 WL 5581049, at *5 (E.D.N.C. 2014) (unpublished); Everts v. Parkinson, 147 N.C. App. 315, 328, 555 S.E.2d 667, 676 (2001); Fulton v. Vickery, 73 N.C. App. 382, 388, 326 S.E.2d 354, 358 (2003).

show that they are entitled to pierce Westin's corporate veil to hold Vistana liable in tort. A court can "disregard the corporate form or pierce the corporate veil, . . . whenever necessary to prevent fraud or to achieve equity." Timberland Integrated Invs., LLC v. Welch, 225 N.C. App. 641, 651, 737 S.E.2d 809, 817 (2013) (quotations omitted); see Glenn v. Wagner, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). Specifically, "when a corporation operates as the mere instrumentality or alter ego of its sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of [North Carolina], the corporate entity will be disregarded and the corporation and the shareholder treated as one and the same person." Capparelli v. Amerifirst Home Improvement Fin. Co., 535 F. Supp. 2d 554, 560 (E.D.N.C. 2008) (quotation omitted); see Martin v. Pilot Indus., 632 F.2d 271, 276 (4th Cir. 1980); Henderson v. Sec. Mortg. & Fin. Co., 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968).

> North Carolina courts consider three elements when deciding to pierce the corporate veil:
>
> (1) Control, not mere majority or complete stock control, but complete domination, not only in finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Glenn, 313 N.C. at 455, 329 S.E.2d at 330; Welch, 225 N.C. App. 652, 737 S.E.2d at 817. Courts consider these elements in light of several factors: "1. Inadequate capitalization ("thin corporation"); 2. Non-compliance with corporate formalities; 3. Complete domination and control of the corporation so that it has no independent identity; and 4. Excessive fragmentation of a single enterprise into separate corporations." Glenn, 313 N.C. at 455, 329 S.E.2d at 330–31; Welch, 225 N.C. App. 652, 737 S.E.2d at 817. When evaluating the elements, courts focus on the "reality of the

situation and determine if an element of injustice or abuse of corporate privilege exists." <u>Welch,</u> 225 N.C. App. at 652, 737 S.E.2d at 818; <u>see</u> <u>Glenn,</u> 313 N.C. at 458, 329 S.E.2d at 332.

As for the Ferrantes' tort claims, no evidence supports piercing Westin's corporate veil to hold Vistana liable for the Ferrantes' claims regarding the Bay Vista Interest. Accordingly, the court grants summary judgment to Vistana on the Ferrantes' tortious interference with contract claims.

Next, the Ferrantes assert breach of contract, improper foreclosure, and punitive damages claims against Vistana concerning the Coral Vista I and Coral Vista II Loan Documents. Vistana, however, was not party to these documents. As discussed, Vistana is not liable under contracts to which it is a third party, and the Ferrantes fail to produce any evidence showing that Vistana had third-party obligations under the Coral Vista I or Coral Vista II Loan Documents. Accordingly, the court grants summary judgment to Vistana on the Ferrantes' breach of contract, improper foreclosure, and punitive damages claims concerning the Coral Vista I and Coral Vista II properties.

### B.

The Ferrantes allege three claims against Westin related to the contracts for the Coral Vista I and Coral Vista II properties. As discussed, the court applies North Carolina substantive law, including the state's choice of law rules. North Carolina enforces contractual choice-of-law provisions as long as the parties "had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental public policy of [North Carolina] or otherwise applicable law." <u>Sawyer v. Market Am., Inc.,</u> 190 N.C. App. 791, 794, 661 S.E.2d 750, 752 (2008) (quotation omitted); <u>see</u> N.C. Gen.Stat. § 25-1-301; <u>Tanglewood Land Co.,</u> 299 N.C. at 262, 261 S.E.2d at 656; <u>Torres v. McClain,</u> 140 N.C. App. 238, 241, 535 S.E.2d 623, 625 (2000). The Ferrantes contractually agreed that U.S. Virgin Islands law would apply to any claims under the contract. The Ferrantes acknowledge and do not dispute the provision, and the choice is reasonable. Thus, U.S.

Virgin Islands law applies to the Ferrantes' claims.

The Ferrantes allege that Westin breached the Coral Vista I and Coral Vista II contracts when Westin foreclosed on both properties. See Am. Compl. at 3–5. "Courts in the Virgin Islands have historically recognized four elements underlying a claim for breach of contract: (1) an agreement; (2) a duty created by that agreement; (3) a breach of that duty; and (4) damages." Phillip v. Mansanto, 66 V.I. 612, 620 (2017); see Pollara v. Chateau St. Croix, LLC, 58 V.I. 455, 473–76 (2015). "In examining a contract, the [c]ourt is to interpret the contracting parties' intent as objectively manifested by them and make a preliminary inquiry as to whether the contract is ambiguous." Sunshine Shopping Center, Inc. v. KMart, Corp., 85 F. Supp. 2d 537, 540 (D.V.I. 2000). "If a contract is unambiguous, the meaning of its terms is a question of law. If, however, a contract is ambiguous and extrinsic evidence offered in support of interpretation is disputed, the meaning of the contract's terms is a question of fact." Phillip, 66 V.I. at 624; see United Corp. v. Tutu Park Ltd., 55 V.I. 702, 707–08 (2011).

The Virgin Islands follow the "plain meaning rule." Sunshine, 85 F. Supp. 2d. at 540; In re Carpe Diem 1969 LLC, 2019 WL 3413841, at *5 (D.V.I. 2019) (unpublished). The rule "assumes that the intent of the parties to an instrument is embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Sunshine, 85 F. Supp. 2d. at 540 (quotation omited); Carpe Diem, 2019 WL 3413841, at *5. Contracts are interpreted "in their entirety: all writings that are part of the same transaction are interpreted together." Carpe Diem, 2019 WL 3413841, at *5; Delponte v. Coral World Virgin Islands, Inc., 48 V.I. 386, 389 (D.V.I. 2006).

"A contract may be found ambiguous if it is susceptible to two or more interpretations." Finely v. Mole, No. 2014-52, 2015 WL 1541126, at *4 (D.V.I. 2015) (unpublished); Sunshine, 85

F. Supp. 2d. at 540; cf. Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980). In determining whether a contract is unambiguous, "a court is not always confined to the four corners" of the contract. Sunshine, 85 F. Supp. 2d. at 540. Thus, "[b]efore making a finding concerning the existence or absence of an ambiguity, [courts] consider the contract language . . . and the extrinsic evidence offered in support of each interpretation." White v. Spenceley Realty LLC, 53 V.I. 666, 678–79 (2010) (quotation omitted); see United Corp, 55 V.I. at 707–08. "Extrinsic evidence may include . . . the conduct of the parties that reflects their understanding of the contract's meaning." White, 53 at 678–79 (quotation omitted); see United Corp, 55 V.I. at 707–08. A latent ambiguity "will typically defeat a motion for summary judgement." White, 53 at 678–79; see United Corp, 55 V.I. at 708.

As for the Ferrantes' contract claims, the Coral Vista I and Coral Vista II contracts unambiguously state the loan payment obligations, the acts that trigger default, and the penalty for failure to pay. Furthermore, the Ferrantes fail to raise a genuine issue of material fact regarding their obligation to make payments under the Coral Vista I or Coral Vista II contracts. Accordingly, the court grants Westin's motion for summary judgment on the Ferrantes' breach of contract claims.

The Ferrantes also argue that Westin's strict foreclosure on the Coral Vista I and Coral Vista II properties was improper. See Am. Compl. at 3–5. States have created "diverse networks of judicially and legislatively crafted rules governing the foreclosure process," some of which allow for strict foreclosure of property interests. BFP v. Resolution Trust Corp., 511 U.S. 531, 541 (1994). The Virgin Islands Commercial Code section 9-620 provides for strict foreclosure. Specifically, section 9-620(a) allows for acceptance of collateral in full satisfaction of a debt if "the debtor consents to the acceptance under subsection (c)." V.I. Code Ann. tit. 11a, § 9-620(a). A debtor "consents" if he "agrees to the terms of the acceptance" after default in an authenticated record, or

if the secured party:

> (A) sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained; (B) in the proposal, proposes to accept collateral in full satisfaction of the obligation it secures; and (C) does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent.

Id. § 9-620(c)(2). A creditor's acceptance of collateral in full satisfaction of debt discharges the debtor's obligation, gives the secured party all of debtor's rights in the collateral, and eliminates the security interest and any junior interest. See id. § 9-622(a). Throughout the foreclosure process, the secured party must act in good faith. See id. § 9-620 cmt. 11.

As for the Ferrantes' improper-foreclosure claim, Westin complied with the statutory requirements for strict foreclosure, and the Ferrantes did not object within the statutorily-prescribed time. Accordingly, the court grants Westin's motion for summary judgment on the Ferrantes' improper foreclosure claims.

The Ferrantes also assert a claim for punitive damages based on the Ferrantes' allegation that Westin "intentionally t[ook] advantage of" them. See Am. Compl. at 5. Punitive damages are "damages awarded in cases of serious or malicious wrongdoing to punish or deter the wrongdoer or deter others from behaving similarly." Cornelius v. Bank of Nova Scotia, 67 V.I. 806, 824 (2017) (quotation omitted). "Punitive damages must be based upon conduct that is not just negligent but shows, at a minimum, reckless indifference to the person injured—conduct that is outrageous and warrants special deterrence." Id. The party claiming punitive damages must establish such conduct by clear and convincing evidence. See Guardian Ins. Co. v. Joseph, 31 V.I. 145, 151 (Dist. Ct. V.I. 1994); Justin v. Guardian Ins. Co., 670 F. Supp. 614, 617 (D.V.I. 1987); see also Berroyer v. Hertz, 672 F.2d 334, 340–41 (3d Cir. 1982).

As for the Ferrantes' claim for punitive damages, Westin's conduct under the contracts

complied with governing law. Lawful conduct is not "outrageous." Accordingly, the court grants summary judgment to Westin on the Ferrantes' punitive damages claim.

Next, the Ferrantes assert what the court interprets to be a breach of contract claim against Westin based on Westin's denying the Ferrantes' use of the Bay Vista Interest. See Am. Compl. at 5. As discussed, the court applies U.S. Virgin Islands law to the Ferrantes' breach of contract claim. The Ferrantes agreed in the Bay Vista Agreement to the penalties concerning non-payment of annual assessments for the property. One of the penalties included denial of use of the Bay Vista Interest. Westin complied with the clear, unambiguous terms in the Bay Vista Agreement. Accordingly, the court grants summary judgment to Westin on the Ferrantes' breach of contract claims concerning the Bay Vista Interest.

### III.

In their motion for summary judgement, the Ferrantes argue that the contract language at issue fails to provide authority to Westin to charge "point assessments." See [D.E. 64] 4–5. Specifically, although the Ferrantes admit that they agreed to pay "maintenance fees," they claim they never understood the contractual fees to include "assessments," and also assert that such "assessments" are extra-contractual. See id. at 5. The Ferrantes also allege that Westin's foreclosure process on the Coral Vista I and Coral Vista II properties "lacked any legal or factual basis." Id. at 7. Finally, the Ferrantes seek punitive damages based on defendants' alleged "abusive conduct." Id. at 7.

Each of the Ferrantes' claims are based on the Bay Vista Interest, Coral Vista I, and Coral Vista II contracts. Accordingly, U.S. Virgin Islands law applies.

As for the Ferrantes' claims concerning the Bay Vista Interest assessments, the Ferrantes agreed, in both the Bay Vista Agreement and Bay Vista Declaration, to pay the assessments of which

they complain. See Ex. B [D.E. 71-2] 4; Ex. C [D.E. 71-3] 4–5, 8. The Ferrantes also agreed, in both the Bay Vista Agreement and Bay Vista Declaration, that their failure to pay the assessments may result in Westin denying their use of the Bay Vista Interest. Ex. B [D.E. 71-2] 4; Ex. C [D.E. 71-3] 26. As discussed, Vistana was not party to the Bay Vista Interest contracts. Accordingly, the court denies the Ferrantes' motion for summary judgment on contract claims regarding the Bay Vista Interest.

As for the Ferrantes' claims concerning Westin's foreclosure on the Coral Vista I and Coral Vista II properties and claims for punitive damages, the court addressed this issue in the context of Westin's motion for summary judgment. Accordingly, the court denies the Ferrantes' motion for summary judgment concerning the Coral Vista I and Coral Vista II foreclosures and request for punitive damages.

As for the Ferrantes' claims regarding Point Assessments under the Coral Vista I and Coral Vista II Purchase Agreements, the Ferrantes agreed to pay such assessments in the Purchase Agreements. See Exs. H, L [D.E. 71-8, 71-12]. The Ferrantes appear to argue, however, that they were unilaterally mistaken about the language in the contracts. See Am. Compl. at 2–3; [D.E. 64] 5.

The Virgin Islands courts look to the Restatement (Second) of Contracts ("Restatement") for principles of unilateral mistake. See Ice Cube Delivery, Inc. v. Virgin Islands Water & Power Auth., 9 V.I. 197, 200 (Mun. Ct. V.I. 1973); Hendricks v. Clyne, No. ST-16-CV-147, 2019 WL 624666, at *8 (Sup. Ct. V.I. 2019) (unpublished); cf. Alexander v. Anthony Intern., L.P., 341 F.3d 256, 264 (3d Cir. 2003); Holiday Homes of St. John v. Lockhart, 678 F.2d 1176, 1181 & n.4 (3d Cir. 1982). The Restatement defines mistake as "a belief that is not in accord with the facts." Restatement (Second) of Contracts § 151. The Ferrantes must show that:

a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and[:] (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) of Contracts § 153; see Holiday Homes, 678 F.2d at 1181 n.4.

The Ferrantes do not allege that Westin either had reason to know or caused the Ferrantes' alleged mistake as to contract fees. Thus, the contract must be unconscionable in order for the Ferrantes' claim to succeed. "To find that an agreement is unconscionable, both [procedural and substantive] elements must be proven: first, that the contractual terms are unreasonably favorable to the drafter, and [second,] that there is no meaningful choice on the part of the other party regarding acceptance of the provision." Reynolds v. Islands Mech. Contractors, Inc., Civ. No. 09-cv-83, 2010 WL 4683719, at *4 (D.V.I. 2010) (unpublished) (quotation omitted); see, e.g., Foy v. Ambient Techs., Inc., No. 08-77, 2009 WL 1766718, at *2 (D.V.I. 2009) (unpublished). A plaintiff has the burden of proving unconscionability. See Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999); Reynolds, 2010 WL 4683719, at *4.

The first element "is generally satisfied if the agreement constitutes a contract of adhesion." Alexander, 341 F.3d at 265. "A contract of adhesion is one which is prepared by the party with excessive bargaining power who presents it to the other party for signature on a take-it-or-leave-it basis." Id. (quotation omitted). At the same time, a contract is "not unconscionable merely because the parties to it are unequal in bargaining position." Restatement (Second) of Contracts § 208 cmt. d; see Alexander, 341 F.3d at 265; Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991). Moreover, consumer contracts are not per se contracts of adhesion. See AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 346–47 (2011); Allen v. Hovensa, L.L.C., 59 V.I. 430, 439–40 (2013).

20

The second element "refers to contractual terms that are unreasonably favor one side to which the disfavored party does not assent." Green Tree, 183 F.3d at 181; see Alexander, 341 F.3d at 265. "[G]ross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms." Restatement (Second) of Contracts § 208 cmt. d; see Alexander, 341 F.3d at 265; cf. Plaskett v. Bechtel Intern, Inc., 243 F. Supp. 2d 334, 340 (D.V.I. 2003). The court may consider, among other factors, whether the stronger party believes the weaker party will not receive substantial benefits of the contract, whether the stronger party knows the weaker party cannot protect its interests because of physical or mental defects, and whether the stronger party believes that the weaker party will not fulfill the contract. See Restatement (Second) of Contracts § 208 cmt. d. At the same time, evidence of a "bad bargain," without more, does not render a contract unconscionable. Camerlo v. Howard Johnson Co., 710 F.2d 987, 992 (3d Cir. 1983); see Plaskett, 243 F. Supp. 2d at 340. Furthermore, "the mistaken party bears the substantial burden of showing unconscionability." Restatement (Second) of Contracts § 153 cmt. c. In so doing, the party "must ordinarily show not only the position he would have been in had the facts been as he believed them to be but also the position in which he finds himself as a result of his mistake." Id.

The purchase agreements are not contracts of adhesion, and the Ferrantes fail to create a genuine issue of material fact as to whether they did not assent to the Purchase Agreement terms. Moreover, no evidence tends to show that Westin believed that the Ferrantes would not receive the substantial benefits of the contracts. In addition, the Coral Vista I and Coral Vista II Loan Documents state the contractual obligations. Finally, the Ferrantes fail to provide evidence showing

21

Westin believed the Ferrantes would not fulfill the Purchase Agreement terms. Accordingly, the Ferrantes' claim of unilateral mistake fails.

IV.

In sum, the court GRANTS defendants' motions for summary judgment [D.E. 48, 55] and DENIES plaintiffs' cross-motion for summary judgment [D.E. 64]. Defendants may file a motion for costs in accordance with this court's local rules and the Federal Rules of Civil Procedure. The clerk shall close the case.

SO ORDERED. This 29 day of January 2020.

JAMES C. DEVER III
United States District Judge